IN THE MATTER OF THEODORE J. KAZLOW, AN ATTORNEY-AT-LAW.

Argued Sept. 13, 1983, and Oct. 25, 1983—Decided Nov. 9, 1984.

*David E. Johnson, Jr.,* Director, Office of Attorney Ethics, and *Michael L. Park* argued the cause for complainant Disciplinary Review Board.

*James S. Webb* and *Matthew R. McCrink* argued the cause for respondent (*McCrink, Nelson & Kehler,* attorneys; *Matthew R. McCrink* and *Mark W. Ford,* on the brief).

PER CURIAM.

This disciplinary proceeding against respondent, Theodore J. Kazlow, arises out of two complaints filed by the District I Ethics Committee (Committee), identified as the Karwick and Crandley matters.

In the Crandley matter, the Committee found that respondent had committed unethical conduct by misrepresenting himself as a fully licensed attorney in violation of *R.* 1:21–3. The Disciplinary Review Board (DRB) found that the record not only supported the Committee's finding, but found further that respondent had misrepresented the status of an action to a client in violation of *DR* 1–102(A)(4) and that respondent's conduct adversely reflected on his fitness to practice law in violation of *DR* 1–102(A)(6).

The Karwick matter centered on respondent's investment of his client's funds in Compcord, Inc. and on the use of his client's funds to operate his law office. The Committee found that

respondent had been "grossly negligent," but stopped short of finding that respondent had intentionally misappropriated his client's funds.

The DRB, however, found that the facts "compel the conclusion that respondent, when incorporating Compcord, Inc., saw an opportunity to make a quick profit for himself, and utilized his client's money to take advantage of that opportunity." Implicit in that finding is the conclusion that respondent intentionally misappropriated his client's funds.

As found by the DRB, the relevant facts are:

I. *Karwick Matter*

In April of 1981, the respondent was retained by Loretta J. Karwick to represent her at settlement on the sale of her home. Mrs. Karwick was a neighbor of the respondent and his mother. She became depressed following the death of her husband, and was under psychiatric care and taking medication for depression when she retained the respondent. Since she intended to undergo immediate voluntary treatment and would not be available for the scheduled settlement, she executed what she recalled to be a blank Power of Attorney in favor of the respondent. She testified that she understood that the respondent would attend the closing for her and would take possession of the net proceeds of the estate. Respondent was then to forward between $5,000 and $10,000 to Mrs. Karwick, and was to invest the balance in certificates of deposit. After reaching this agreement with respondent, Mrs. Karwick voluntarily entered the Seabrook Rehabilitation Center, a facility for the treatment of alcoholism. Mrs. Karwick remained there for five weeks. She then spent three months at a halfway house and thereafter moved to a 'three-quarter' home, where she remained until May of 1982.

Prior to entering Seabrook, and at the respondent's suggestion, Mrs. Karwick gave her two checkbooks, one savings account passbook and a stock certificate to the respondent. The stock certificate was eventually returned to Mrs. Karwick. Excluding that stock certificate, the assets turned over to the respondent, including the funds gained from the sale of the house, totaled $78,080.01, according to the accountant who was retained by the Division of Ethics and Professional Services to investigate this matter.

Following receipt of the $62,394.88 obtained from the sale of the Karwick property, the respondent opened an account, entitled the Theodore James Kazlow Operating Account, at the Union Trust Company in Wildwood, New Jersey and deposited those monies in this account on April 30, 1981. Thereafter, on May 16, 1981, the respondent withdrew $50,000 and purchased a Certificate of Deposit for that amount in the name of Loretta Karwick, c/o Theodore J. Kazlow at Union Trust Company. The certificate has a November 16, 1981 maturity date. The 1981 Statement of Earnings marked as Exhibit J–1 in evidence at the ethics hearing shows that the Certificate of Deposit earned

$942.41 in 1981 but that a penalty of $1,999.90 was assessed due to early close out. Respondent claimed to have thereafter invested the $50,000 in a company known as Compcord, Inc., although he produced no supporting documentation.

At no time did Mrs. Karwick authorize this 'investment'. Indeed, she was unaware of respondent's actions for some time and was unable to obtain an accounting from him.

The accountant's report further indicates that, although respondent claimed administration fees of $1300 and expenditures on behalf of Mrs. Karwick in the amount of at least $8,000, a total of $2,693.96 from the Karwick funds deposited in respondent's operating account could not be accounted for by the accountant. Additionally, although a total of 46 checks were written by respondent for the operation of his law practice, he deposited only $570 of his own money in the 'operating account' during this time. The accountant further determined that respondent maintained no other accounts for his law practice.

As to Mrs. Karwick's remaining savings and checking accounts turned over to the respondent, the accountant found further problems. No activity was discovered with regard to First People's Bank Checking Account Number 4–507–885 which contained $851.30 as of July 15, 1981. First People's Bank Savings Account Number 1038–113312 contained $2,958.65 on July 25, 1981 when closed by the respondent. The respondent stated that $58.65 was given to Mrs. Karwick, and $2900 was given to the principals of Compcord as additional investment. No record of this investment was produced. The remaining checking account was held with First National State Bank of South Jersey, Account Number 296–350–7. That account had a balance of $11,911.01 in May 1981 when respondent gained control. By September 9, that account contained $6.16. The checks which issued on this account were written to either Loretta Karwick, cash, or Theodore Kazlow, and were endorsed 'Loretta Karwick by Theodore Kazlow.'

While the respondent contended that he invested a total of $65,175 in Compcord, Inc., this was never verified by any documentation. That corporation is no longer solvent. The respondent alleged to the accountant that he was attempting to shelter Mrs. Karwick's money from a suit for specific performance against her, which arose from her failure to follow through on a contract for the purchase of a home in Burlington County. However, respondent's explanation is inconsistent with the answer filed by him in that action on Mrs. Karwick's behalf. There, he stated that Mrs. Karwick was incompetent at the time the contract was entered into. Significantly, the contract to purchase the Burlington County home was entered into prior to the time she signed the Power of Attorney.

Following hearing on the matter, the District I Ethics Committee found as follows:

' 1. Respondent failed to maintain a trust account and failed to maintain the required bookkeeping records in accordance with *R.* 1:21–6.

2. The respondent commingled the funds generated by his law practice with those funds belonging to the complainant.

3. The respondent failed to accede to the complainant's reasonable request for an accounting of funds belonging to her and further failed to segregate those funds and to pay them to the complainant upon her request.

4. The respondent failed to notify complainant of the receipt of the complainant's funds, securities or other properties.

*5. No evidence was adduced to suggest that the respondent had done work for Compcord or was motivated in any way other than a belief that the investment was in the best interest of the client.

6. Compcord was not a proper vehicle for the investment of trust funds and the investment in that vehicle was grossly negligent.'

The Committee concluded that respondent had violated *DR* 1-102(A)(1) and (6), *DR* 6-101(A)(1), *DR* 7-101(A)(3) and *DR* 9-102. The Committee did not specifically find misappropriation of funds although it did note the existence of expenditures of $2,693.81 'for purposes other than those which would benefit respondent's client'.

II. *Crandley Matter*

The respondent was granted a limited license to practice law on December 15, 1978. He did not complete the Skills and Methods Course necessary to gain plenary admission until the early fall of 1980. He obtained his plenary license to practice law on December 3, 1980. From the time of his limited admission through the end of October 1980, the respondent was employed by a succession of law firms in the Cape May County area.

During October of 1980, the respondent, although in the employ of a law firm, accepted a $100 cash retainer from Thomas Crandley to represent him in a divorce action. A receipt for that cash, actually given in November of 1980, was backdated to October 30, 1980 and was signed 'Theodore James Kazlow, Esquire'. Crandley was in contact with the respondent on a regular basis to ascertain the status of his case. He contended that the respondent continually assured him that the complaint had been filed and the matter was about to be heard. In actuality, Kazlow never filed the complaint. He did, however, prepare two separate complaints, since the first draft required a correction. Although one of these complaints bears a signature which purports to be that of Crandley, Crandley denies ever signing the document. The respondent stated that although he executed what was, in fact, an unnecessary jurat (wherein the respondent referred to himself as an attorney-at-law of the State of New Jersey), he was out of the room when the Certification was signed and did not ask Crandley thereafter whether he had signed the document.

---

*The Board notes that this finding directly contradicts respondent's counsel's statements to the Board on May 19, 1982 at hearing on a motion for respondent's temporary suspension. That transcript is peppered with references to the fact that respondent actually incorporated Compcord, Inc. T 13:7–10; T 17:22–25; T 18:12.

By March of 1981, Crandley had contacted another attorney and had verified with the Superior Court Clerk's Office in Trenton that no complaint for divorce was ever filed by the respondent. The respondent turned over Crandley's file to him, but advised that he did not have the $100 to return. Crandley made numerous attempts to obtain his money and finally went to the respondent's office. Respondent's secretary then presented Crandley with a Release, which Crandley was directed to sign to obtain the $100. That release, marked as P–3 in evidence, states in part: '... in consideration of the return of my one-hundred (100) dollar retainer fee I will not and am prohibited from the making of any statements concerning my relation to or status of my professional consultations and all accompanying matters concerning the aforementioned action'. Crandley would not sign the release. The respondent personally returned the $100 on the next day without reference to the release. The respondent explained that he wanted a signed release because of problems outside the divorce action which he did not wish to be made public. He apparently was in some way personally involved with the present Mrs. Crandley, who was then Crandley's girlfriend.

Crandley denies that respondent advised him that a two month delay in the processing of the divorce was necessary because of respondent's limited license.

The Committee found that respondent had violated R. 1:21–3 by holding himself out as a fully licensed attorney when he in fact possessed only a limited license for the practice of law. The Committee concluded that respondent's actions resulted from inexperience, ignorance as to the governing rules and from his personal relationship with the parties concerned, and recommended only a private reprimand.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee in finding unethical conduct on the part of the respondent are fully supported by clear and convincing evidence. In *Crandley*, it is clear that the respondent misrepresented the status of the action to the client in violation of *DR* 1–102(A)(4). Additionally, he directly violated R. 1:21–3 by taking a fee and holding himself out as an attorney fully licensed to practice law while holding only a limited license. This, too, constitutes a misrepresentation which violates *DR* 1–102(A)(4), and, furthermore represents improper conduct which adversely reflects on respondent's fitness to practice law. *DR* 1–102(A)(6).

The *Karwick* matter presents a more serious case of attorney misconduct. While the Board agrees with the bulk of the Committee's findings, including commingling, failure to comply with R. 1:21–6 by maintaining appropriate books and records, and failure to invest client's money properly, the Board is further convinced that the respondent is guilty of misappropriation of funds. At minimum, the $2,693.96 which the accountant could not locate may be presumed to have been taken by the respondent for his own purposes. The $65,175 which respondent claims to have invested in Compcord, Inc. must also be considered to be misappropriated funds as defined by *In re Wilson*, 81 *N.J.* 451, 455 fnl (1979). The respondent's use of these funds was clearly unauthorized. He did

not obtain any proof of investment for his client such as stock certificates. The investment was totally unsecured. His alleged rationale, that of hiding funds to avoid a possible future judgment for specific performance, does not find support in the surrounding facts given the client's apparent lack of capacity at the time she contracted to buy the Burlington County property. Indeed, the respondent knew when he obtained the $50,000 Certificate of Deposit on May 16 that Mrs. Karwick had not complied with her contract to purchase the Burlington County property and would be subject to a suit for specific performance. The facts therefore compel the conclusion that respondent, when incorporating Compcord, Inc., saw an opportunity to make a quick profit for himself, and utilized his client's money to take advantage of that opportunity.

The Board therefore recommends that the respondent be disbarred.

■ The critical issue is whether the record supports the conclusion that respondent misappropriated Mrs. Karwick's funds. If so, then disbarment is required. *In re Wilson*, 81 *N.J.* 451 (1979). Misappropriation is defined in *Wilson* as "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *Id.* 81 *N.J.* at 455 n. 1. Hence, the question is whether respondent made any unauthorized use of his client's funds for his own purpose, even if he did not profit from the Compcord transaction.

■ Although the Committee found that respondent "commingled" his own funds with those of Mrs. Karwick and that respondent had been "grossly negligent," it also found an absence of proof that respondent "was motivated in any way other than a belief that the investment was in the best interest of the client." This finding contrasts with the conclusion drawn by the DRB that respondent had misappropriated Mrs. Karwick's funds.

Although we have scoured the record, our efforts to uncover the truth have been hampered by respondent's failure to testify before the Committee and to appear, personally or through counsel, before the DRB. The supplemental materials proffered to us by respondent's counsel do no more than support the conclusion that there were, in fact, two principals of Compcord, a Mr. Gem Land and a Mr. Lawrence Schmidt, and that

according to a polygraph test respondent was telling the truth when he said he invested Mrs. Karwick's funds on her behalf. The ambiguous nature of the power of attorney prepared by respondent and his own failure to testify, however, fail to establish that he had any authority to invest Mrs. Karwick's funds in so speculative a venture.

Mrs. Karwick; on the other hand, was definite in her testimony before the Committee that she had authorized respondent to invest her funds only in a certificate of deposit or bank account and to use the balance to pay her expenses. She specifically testified that respondent never consulted her about the premature withdrawal of funds represented by the certificate of deposit or about the investment of her funds in Compcord. The corporate records are, at best, ambiguous and do not support respondent's contention that he invested Mrs. Karwick's funds in Compcord for her benefit and not his own.

Respondent does not dispute that he had no trust account and that he commingled Mrs. Karwick's funds with his own. He admits to the use of $2,673 for expenses related to his law practice, but seeks to justify the use on the theory that he was entitled to the money in payment for his services. Yet, he had no retainer agreement with Mrs. Karwick and submitted no bill to her. As indicated, respondent did not testify in support of his defense. Under the circumstances, the unexplained misuse of the client's funds gives rise to the inescapable inference that respondent used his client's money for his own purposes.

Insofar as the $65,000 investment in Compcord is concerned, we may accept that respondent arranged for the filing of a certificate of incorporation, that he obtained a set of corporate books, and that he was the registered agent for the corporation. But respondent did not refute Mrs. Karwick's testimony that she did not authorize the investment. Nor did he prove that he used the funds for her benefit, and not his own. Considering the condition of his client, the amount and nature of the

investment, and the respondent's dubious authority to invest his client's funds, his conduct is incredible.

One fact is certain: because of respondent's conduct, Mrs. Karwick is now impoverished. At a time when she recognized her inability to manage her affairs, she entrusted him with the management of her property. Respondent breached that trust and reduced her to poverty. In short, he ruined her.

The egregious facts of this case, as determined by our independent review of the record, support the conclusion of the DRB that respondent misappropriated his client's funds. We now adopt the findings of the DRB and conclude that respondent's conduct requires disbarment.

We further order that respondent reimburse the Office of Attorney Ethics for appropriate administrative costs, including production of transcripts.

So Ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.

### ORDER

It is ORDERED that THEODORE J. KAZLOW of VILLAS be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that THEODORE J. KAZLOW be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that THEODORE J. KAZLOW reimburse the Office of Attorney Ethics for costs, including the production of transcripts; and it is further

ORDERED that THEODORE J. KAZLOW comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.